**PALMENTERE BROTHERS CARTAGE SERVICE,** Appellant,

v.

**Wanda WRIGHT, Respondent;**

**Treasurer of the State of Missouri— Custodian of the Second Injury Fund, Respondent.**

**No. WD 75921.**

Missouri Court of Appeals, Western District.

Sept. 3, 2013.

Application for Transfer to Supreme Court Denied Oct. 1, 2013.

Douglas M. Greenwald and Eric T. Lanham, Kansas City, MO, for appellant.

Eric W. Lowe, Kansas City, MO, and Donald T. Taylor, Kansas City, KS, for respondent.

Before Division Three: LISA WHITE HARDWICK, Presiding Judge, MARK D. PFEIFFER and CYNTHIA L. MARTIN, Judges.

LISA WHITE HARDWICK, Judge.

Palmentere Brothers Cartage Service ("Palmentere") appeals from the Labor and Industrial Relations Commission's ("Commission") final award that found Wanda Wright to be permanently and totally disabled as result of her work injury and, therefore, did not assess liability against the Treasurer of the State of Missouri as Custodian for the Second Injury Fund. Palmentere contends the Commission's finding that Wright's permanent total disability was the result of the last injury alone is unsupported by competent and substantial evidence. For reasons explained herein, we affirm the Commission's award.

FACTUAL & PROCEDURAL HISTORY

Wanda Wright began working for Palmentere as a truck driver in 2003 at the age of forty-two. On December 2, 2003, Wright was traveling as a passenger in a tractor trailer driven by a fellow Palmentere's driver. While in route from Kansas City to Dallas, Texas, the tractor trailer went off the road in Franklin County, Kansas, resulting in an accident and causing physical injuries to Wright's back, neck, and left lower extremity.

Shortly after the accident, Wright moved to Texas and began working as a truck driver for W.W. Rowland. She continued working despite experiencing significant left knee pain with swelling and popping as a result of the injuries she sustained in the 2003 work accident. Following a 2005 MRI, which indicated a "complete tear of the anterior cruciate ligament," Wright underwent two arthroscopy surgeries to her left knee. However, Wright's symptoms persisted after her surgeries, and because she could no longer press the clutch of her truck, she was unable to continuing working for W.W. Rowland. Wright has not worked since 2006.

In 2006, due to continued problems with her left knee, Wright began seeing Dr. Richard Robichaux, Jr., an orthopedic surgeon, who ultimately performed a partial knee replacement on Wright in 2007. Wright's condition, however, only seemed to worsen after the partial knee replacement surgery. Not only did the surgery fail to provide Wright significant physical improvement, but Dr. Robichaux also began to report that Wright was suffering from depression and anxiety following the 2007 surgery. Dr. Robichaux was the first doctor to comment about any psychological issues affecting Wright. In October 2007,

Dr. Robichaux began prescribing mental health medications for Wright.

On November 13, 2007, Dr. Robichaux reported:

It is difficult for me to say at this time whether or not Ms. Wright will ever be able to return to work. The patient is doing well from her surgery, but she seems to have a great deal of emotional overlay. The patient does have what appears to be some symptom magnification.

Then, in March 2008, Dr. Robichaux reported that Wright was considering getting a job. Wright told Dr. Robichaux that she tried getting a job as a cashier, but she could not stand all day. Dr. Robichaux noted that Wright was "kind of stuck because she cannot stand on her feet for an extended period."

At Wright's next visit with Dr. Robichaux, she was utilizing a cane for ambulation and her mental state had deteriorated further. Dr. Robichaux noted that Wright looked as if she had not slept in a couple of days. Dr. Robichaux also stated: "She just looks so terribly unhappy and she looks like she really needs some help." In regards to Wright's physical condition, Dr. Robichaux concluded that the only work Wright would be capable of doing would be sedentary work.

At a follow-up visit with Dr. Robichaux in June 2008, Wright was despondent, crying, and stating that she felt like she wanted to "end it all." Wright reported to Dr. Robichaux that her left knee was "pop[ping] and swell[ing] and [that] she [could not] straighten it out all the way and [that] it just hurt[ ] all day every day." Wright stated that she regretted having the partial knee replacement surgery and sometimes felt like she wanted to kill herself.

Dr. Robichaux's last visit with Wright was on October 30, 2008. Dr. Robichaux noted that Wright felt her left leg was dead and numb as if there was no feeling and no muscle power. Wright told Dr. Robichaux that she had been to a few job fairs, but that no one wanted to hire her because she was a job risk. In his report, Dr. Robichaux stated: "I do not think that [Wright] understands that because she is using a cane and she is crying and she is just not well ... nobody is going to hire her not because of her knee issue but because of her underlying emotional state."

In September 2008, Wright began seeing Dr. Ann Arretteig, a psychiatrist, for treatment of suicidal thoughts and her ongoing depression. Dr. Arretteig's notes state that Wright had been thinking of killing herself because of what appeared to be a hopeless situation. Wright reported that she was in constant pain because of her injuries from the 2003 work accident. Wright stated that she felt angry much of the time, ruminated about the past and what she perceived as a bleak future, took hours to go to sleep, woke easily, and had nightmares and flashbacks about the wreck. Wright admitted to overdosing about one month prior to her visit with Dr. Arretteig. Wright also indicated that she fantasized about cutting off her leg because she felt it would be easier to walk with a prosthetic leg. Dr. Arretteig noted that Wright became visibly angry when talking about her unsuccessful knee replacement and was angry at Dr. Robichaux for recommending it and at herself for agreeing to it. Wright stated that she was a different person before her injury, and Dr. Arretteig believed she was still mourning the loss of her physical abilities.

Following a psychiatric evaluation, Dr. Arretteig diagnosed Wright with "Major Depression, Single Episode, Psychotic;"

there was no Axis II diagnosis regarding potential personality disorders. In a December 4, 2008 letter to Wright's attorney, Dr. Arretteig stated that Wright had a history of "what appears to be a learning disability;" however, that history is not further explained or documented in Dr. Arretteig's records. Due to Wright's alleged learning disability, and because Wright continued to experience pain while walking, Dr. Arretteig concluded that Wright was not a good candidate for retraining in a less physically demanding job. Dr. Arretteig stated that in her opinion Wright was unable to function in competitive employment.

In September 2009, Wright was hospitalized at Greenbrier Behavior Health for "suicidal ideation." Wright described herself as helpless, hopeless, and worthless. Wright stated that she does little or nothing during the day and that she has absolutely no enjoyment. Wright related all of these issues back to the 2003 work accident and reported that "she ha[d] absolutely no psychiatric history" prior to the 2003 work accident. Dr. Alan Coe, a psychiatrist at Greenbrier Behavior Health, diagnosed Wright with "Major Depression, Recurrent, Severe Without Psychotic Features" and Anxiety Disorder. Again, like Dr. Arretteig's diagnosis, there was no Axis II diagnosis of any form of personality disorder.

Wright filed a workers' compensation claim against Palmentere and the Second Injury Fund on April 27, 2009. At a February 2012 hearing on the claim, Wright testified and presented her medical records, as well as deposition testimony from Dr. Kathleen Keenan, Dr. Lowery Jones, and Michael Dreiling.

■ Dr. Keenan, a licensed psychologist, evaluated Wright on May 13, 2010 at the direction of the Kansas Division of Workers' Compensation.[1] Dr. Keenan diagnosed Wright with several conditions, including: (1) "Major Depressive Disorder, Recurrent, Severe, without Psychotic Features;" (2) "Pain Disorder Associated With Both Psychological Factors and A General Medical Condition;" and (3) "Learning Disorder [Not Otherwise Specified], by history." At her deposition, Dr. Keenan indicated that she had not conducted any learning disability testing. Dr. Keenan stated that she did not actually diagnose Wright with a learning disability, but "t[ook] that from the history." However, on cross-examination, Dr. Keenan admitted that she never reviewed old school records. Dr. Keenan's conclusion that Wright suffered from a learning disability appears to be based solely on Wright's limited education and Wright's own report that she had difficulty reading. At the hearing, Wright agreed that she is "not a very good reader," but testified that she "wouldn't say [she has] a real learning disability."

In addition, unlike Dr. Arretteig and Dr. Coe, Dr. Keenan diagnosed Wright with an Axis II Borderline Personality Disorder. Dr. Keenan testified that it was her opinion that she could have diagnosed Wright's personality disorder prior to the date of her 2003 work accident. Dr. Keenan cited to Wright's failed marriages and her estranged relationship with her daughter as evidence that Wright's borderline person-

---

1. Wright filed a parallel claim for her injuries against Palmentere in Kansas. Although the record indicates that Palmentere did pay benefits as a result of the Kansas claim, the details of the award are unclear. We note that "[s]uccessive workers' compensation awards in different states, either allowing or denying workers' compensation benefits, are not forbidden by the Full Faith and Credit Clause nor by principles of res judicata or collateral estoppel." *Huff v. Belford Trucking Co.*, 809 S.W.2d 71, 74 (Mo.App.1991).

ality disorder existed prior to the 2003 work accident. Dr. Keenan acknowledged, however, that no other doctor had made an Axis II diagnosis.

Dr. Keenan ultimately rendered Wright an overall psychological impairment of 65%, 35% of which she attributed to Wright's workers' compensation injury and 30% of which she attributed to Wright's "pre-existing factors"—the personality disorder and learning disability. Dr. Keenan testified that these impairments rendered Wright totally disabled and unemployable in the open labor market. On cross-examination, however, Dr. Keenan agreed that it was unlikely that an employer would want to hire Wright based on her presentation and interaction—specifically, Wright's depressed and irritable mood, tearfulness, disturbed sleep, and lethargy.

Dr. Jones, an orthopedic surgeon, performed a medical examination of Wright pursuant to a court order in the Kansas Workers' Compensation proceedings. Dr. Jones opined that Wright's left knee had been repaired as well as possible and did not recommend any further treatment. Dr. Jones testified that Wright's continued use of a cane would be necessary for ambulation. For purposes of Wright's Kansas claim, Dr. Jones deemed her to have sustained a 28% whole body permanent partial impairment. Dr. Jones recommended limiting Wright's work to sedentary activity. Dr. Jones testified that he would defer to a psychologist for purposes of determining whether Wright's mental health issues rendered her unemployable in even a sedentary setting.

Dreiling, a vocational expert, determined Wright to be unemployable. Dreiling's opinion was based on: (1) Wright's orthopedic conditions; (2) Wright's limited education; (3) the learning disability observed by Dr. Keenan; and (4) Wright's psychological problems, which included Dr. Keenan's diagnosis of borderline personality disorder. Dreiling stated that Dr. Jones's medical restrictions alone would not take Wright out of the open labor market. However, Dreiling opined that, when factoring in the learning disability and psychological factors, Wright's "ability to perform unskilled, sedentary work would be significantly impacted." Thus, Dreiling concluded that Wright would be significantly limited in obtaining work in the open labor market and was essentially and realistically unemployable.

On May 24, 2012, the ALJ issued his findings of fact and rulings of law. The ALJ found that all the evidence of Wright's depression and anxiety were subsequent to the 2003 work accident and, thus, found that Wright's "psychological difficulties are based on [her] ongoing left knee dysfunction." The ALJ expressly rejected as not credible Dr. Keenan's and Dreiling's opinions regarding a preexisting personality disorder and an alleged learning disability. On the basis of these findings, the ALJ determined Wright to be permanently and totally disabled solely as a result of the physical injuries she sustained on December 2, 2003, and the depression and anxiety resulting therefrom (collectively, the "primary injury").

Concluding the Second Injury Fund had no liability, the ALJ ordered Palmentere to pay Wright permanent total disability benefits of $394.73 per week for the remainder of Wright's life and to continue to provide psychological and pain medications related to the primary injury.[2] The Commission affirmed the ALJ's benefit award, but issued a supplemental opinion stating:

2. The ALJ found that Palmentere should be "given credit for the Permanent Total Disability benefits they paid as a result of the Kansas Workers' Compensation decision."

We agree with and affirm the ALJ's determination that employee is permanently and totally disabled due to the physical and psychological disabilities she suffered as a result of the primary injury. However, we specifically do not affirm the ALJ's criticisms of Dr. Keenan and Mr. Dreiling's testing methods. Dr. Keenan and Mr. Dreiling provided their opinions as experts in their respective fields and while we find that the weight of the evidence contradicts their opinions to the extent that they suggest employee is not permanently and totally disabled as a result of the primary injury, the ALJ is in no position to criticize the methods they utilized in arriving at their expert opinions. Further, we find that after finding employee permanently and totally disabled as a result of the primary injury, the ALJ's findings with respect to employee's alleged preexisting personality disorder and preexisting learning disability are misplaced and irrelevant.

Palmentere appeals the Commission's final award.

### Standard of Review

■ This court will not disturb the decision of the Commission on appeal unless it acted without or beyond its power, the award was procured by fraud, the facts do not support the award, or the award is not supported by sufficient competent evidence in the record. § 287.495.1. "We examine the whole record to determine the sufficiency of the evidence." *Marmon v. City of Columbia,* 129 S.W.3d 921, 924 (Mo.App.2004). If we find the award is contrary to the overwhelming weight of the evidence, then it is not supported by substantial evidence and we must reverse it. *Id.* In making this determination, "[w]e do not reweigh the evidence; the Commission is the judge of the weight to be given to conflicting evidence and the credibility of the witnesses." *DeLong v. Hampton Envelope Co.,* 149 S.W.3d 549, 554 (Mo. App.2004).

### Analysis

■ Palmentere does not dispute that Wright is totally and permanently disabled. Rather, in its sole point on appeal, Palmentere contends that the Commission's finding that Wright's permanent total disability resulted from the primary injury alone is unsupported by competent and substantial evidence. Palmentere argues that the Second Injury Fund should be responsible for at least a portion of the benefit compensation because Wright's permanent total disability resulted from a combination of the primary injury and preexisting conditions.

■ "The Second Injury Fund compensates workers who are permanently and totally disabled by a combination of past disabilities and a primary work injury." *Pursley v. Christian Hosp. Northeast/Northwest,* 355 S.W.3d 508, 513 (Mo. App.2011). Section 287.220 guides the Commission in determining when there is a previous disability that may be compensable from the Second Injury Fund. The Commission must first determine the degree of disability from the last injury alone. *Mihalevich Concrete Constr. v. Davidson,* 233 S.W.3d 747, 754 (Mo. App.2007). Consequently, preexisting disabilities are not relevant until this determination is made. *Id.* If the primary injury standing alone rendered Wright permanently and totally disabled, then the Second Injury Fund has no liability and Palmentere is responsible for all of the compensation. *Id.*

Here, the Commission determined that Wright is unemployable in the open labor market because she "presents for employment utilizing a cane for ambulation and

has a depressed emotional state." The Commission further concluded that Wright's emotional state was due to her "ongoing left knee dysfunction." Thus, the Commission found Wright to be permanently and totally disabled "based on the accident of December 2, 2003 *in isolation.*" (Emphasis added).

Palmentere contends this finding was erroneous because the Commission improperly disregarded the uncontroverted testimony of Dr. Keenan and Dreiling. Specifically, Palmentere argues that because no medical or vocational expert concluded that the primary injury alone rendered Wright permanently and totally disabled, the Commission was required to conclude, in accordance with Dr. Keenan's and Dreiling's opinions, that Wright's permanent total disability was attributable to a combination of the primary injury, a preexisting learning disability, and a preexisting personality disorder.

Palmentere's argument is flawed in that it confuses causation of injury with extent of disability. In the instant case, all of the treating physicians and medical experts agreed that the 2003 work accident caused the primary injury, and that the primary injury disabled Wright. In fact, Palmentere does not dispute these conclusions on appeal. The point of contention, however, is the extent to which the primary injury disabled Wright. Dr. Keenan's and Dreiling's opinions were that the primary injury alone did not render Wright permanently and totally disabled. Nevertheless, contrary to Palmentere's contention, the Commission was free to find otherwise, even in the absence of conflicting medical and vocational opinions.

In determining the extent of disability, the Commission may reject the uncontradicted opinion of a vocational expert. *Carkeek v. Treasurer of State–Custodian of Second Injury Fund*, 352 S.W.3d 604,

610 (Mo.App.2011). Additionally, while "[i]t is true that the Commission may not reject uncontradicted medical testimony in favor of the ALJ's opinion on the issue of medical causation.... [T]he extent of an employee's disability, and thus employability, is a not an issue of medical causation, nor does it exclusively require medical testimony." *Schussler v. Treasurer of State– Custodian of Second Injury Fund*, 393 S.W.3d 90, 96 (Mo.App.2012) (citation omitted) (citing *Angus v. Second Injury Fund*, 328 S.W.3d 294 (Mo.App.2010)); see also *Carkeek*, 352 S.W.3d at 610 n. 3 ("The *Angus* case deals only with a medical expert's testimony concerning medical causation of an injury."). " 'The extent and percentage of disability is a finding of fact within the special province of the Industrial Commission.' " *Lewis v. Kan. Univ. Med. Ctr.*, 356 S.W.3d 796, 802 (Mo.App. 2011) (quoting *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo.App. 2003)). "As a result, in determining the degree of a claimant's disability, the Commission ... 'may consider all the evidence and the reasonable inferences drawn from that evidence.' " *Schussler*, 393 S.W.3d at 96 (quoting *Carkeek*, 352 S.W.3d at 610 n. 3).

In concluding that the primary injury alone rendered Wright totally and permanently disabled, the Commission relied on Wright's own testimony regarding the severity of her symptoms and her failed attempts to find employment following the surgical intervention on her knee. See *Bock v. City of Columbia*, 274 S.W.3d 555, 563 (Mo.App.2008) (stating that a "claimant's testimony alone can constitute substantial evidence of the extent of the disability"). Wright testified that, despite taking part in several job fairs and actively searching for a job after her partial knee replacement, she had been unable to find employment. Wright further testified that

her depression and anxiety interferes with her performance of day-to-day activities.

Wright's testimony was corroborated by her medical records, which clearly established that the primary injury negatively affects Wright's ability to function on a daily basis. Additionally, in his records, Dr. Robichaux noted his belief that employers would not hire Wright because of her use of a cane and her underlying emotional state. Dr. Keenan even admitted on cross-examination that it was unlikely that an employer would want to hire Wright based on her presentation and interaction. Thus, after considering the whole record, we find that competent and substantial evidence supports the Commission's conclusion that Wright suffered a permanent total disability as a sole result of her primary work injury.

 Because the primary work injury standing alone rendered Wright permanently and totally disabled, any potential preexisting conditions are irrelevant. *Mihalevich*, 233 S.W.3d at 754. Nevertheless, assuming *arguendo* that Palmentere could prove the Commission erred in finding that Wright's permanent total disability resulted solely from the primary injury, and assuming Palmentere could prove the existence of a preexisting personality disorder and learning disability, Palmentere still fails to establish Second Injury Fund liability. The Second Injury Fund is not liable for the progression of a preexisting condition unless the condition was so severe as to constitute a hindrance or obstacle to employment prior to the work-related accident. *Jones v. Washington Univ.*, 239 S.W.3d 659, 666 (Mo.App.2007). There is nothing in the record to suggest that any possible preexisting conditions were a hindrance to Wright's employment before the 2003 work accident.

For all the foregoing reasons, the Commission did not err in concluding the Second Injury Fund had no liability. Accordingly, Palmentere's point on appeal is denied.

### CONCLUSION

The Commission's final award is affirmed.

ALL CONCUR.