## MIHALEVICH CONCRETE CONSTRUCTION,
Appellant,

v.

Jimmie DAVIDSON, Respondent; Treasurer of the State of Missouri—Custodian of the Second Injury Fund, Respondent.

No. WD 67676.

Missouri Court of Appeals, Western District.

Sept. 25, 2007.

Reid Highlander, St. Louis, MO, for appellant.

Dean Lee Christianson, St. Louis, MO, for respondent Davidson.

Cara Lee Harris, Asst. Attorney General, Springfield, MO, for respondent 2nd Injury Fund.

Before PAUL M. SPINDEN, P.J., PATRICIA A. BRECKENRIDGE, and JAMES M. SMART, JR., JJ.[1]

JAMES M. SMART, JR., Judge.

Mihalevich Concrete Construction appeals the decision of the Labor and Industrial Relations Commission (the Commission) upholding the award of the Administrative Law Judge (ALJ) of the Division of Workers' Compensation. The ALJ granted Jimmie Davidson weekly benefits for permanent total disability as a result of injury he sustained while working for Mihalevich. Mihalevich claims the award was erroneous and the Commission erred in upholding it because certain findings were not supported by competent and substantial evidence. We affirm.

## Background

Jimmie Davidson filed two Workers' Compensation claims based upon injuries to his back that arose while he was working for Mihalevich. Davidson also has had some problems with his vision and hearing. Evidence about both of these problems was presented at the hearing, but because these problems are not relevant to the determination of Davidson's disability for purposes of this appeal, we will not discuss them in detail. The first injury occurred on October 12, 2001; the second occurred on June 24, 2003. The claims were consolidated and one hearing was held in which the following issues were to be determined:

1. The nature and extent of Davidson's permanent disability, if any;

2. The liability of Mihalevich and its Insurer, if any, for permanent partial disability benefits or permanent total disability benefits;

3. The liability, if any, of the Second Injury Fund for permanent partial disability benefits or permanent total disability benefits; and

4. Whether Mihalevich should be ordered to provide additional future medical benefits for Davidson pursuant to Section 287.140 [2] for the June 24, 2003, injury.

The parties stipulated as to the rate of compensation, the medical benefits already paid, and that both injuries arose out of and in the course of Davidson's employment with Mihalevich.

The only evidence provided was the testimony of Davidson, the deposition testimony of Dr. Mark Lichtenfeld, the deposition testimony of Timothy G. Lalk, a vocational rehabilitation counselor, and Davidson's medical records.

Davidson has an 11th grade education. He does not have a GED or any other vocational training or education. He does not have any typing or computer skills that would make him viable in the job market. He has not served in the military. He was not permitted to serve in the military because of a curvature in his spine. His work history includes hauling hay, trimming trees, building pole barns, operating a fork lift, and loading and delivering lum-

1. Breckenridge, J., was a member of this court at the time the case was argued and submitted. She was subsequently appointed a judge of the Supreme Court of Missouri but has been reassigned to this court as a special judge for the purpose of disposition of this case.

2. All statutory references are to Missouri Revised Statutes, 2000, unless otherwise noted.

ber. From 1982 to 1990, he drove a concrete mixer. Beginning in 1990, he worked for Mihalevich. His job title was "lead man." As such, he was responsible for the crew's tools and equipment and for setting up the concrete jobs. He worked right along side the other crew members shoveling concrete, using jackhammers, bull floats, and finishing tools, and tearing out old driveways and floors.

Davidson has had various injuries throughout his life, many involving his back. In approximately 1974, Davidson slipped while climbing on a machine. He developed some back pain but was treated on only one occasion and recovered. He was treated again in 1991 for another back strain, which occurred when he got up after pouring a floor. He missed one or two days of work at the time. He was unsure of how he was treated, but may have been given a shot for the pain. He twisted his back in April 1995 when he bent over to pick something up. He received treatment on one or two occasions and then returned to work. He thought he might have missed a few days of work for this injury.

In approximately August of 1998, he developed some sharp pain in his back while bent over hammering and was taken to the emergency room. X-rays were taken of his spine on August 17, 1998, and were normal. He was treated with muscle relaxers and pain medication and missed only a few days of work. In December 2000, he slipped on some ice and was treated with manipulation and restricted duty at work. He was released from care and advised to return to full duty on December 26, 2000.

On October 12, 2001, Davidson was working for Mihalevich. He was bent over, nailing forms with a hammer. He felt pain in his back and both legs while swinging the hammer and could not straighten his back. He advised his boss but was told to just take it easy and continue working. The following day the pain was much worse, and he went to see a chiropractor. Then on October 15, 2001, he saw Dr. Robert W. Sparks. An MRI done on October 18, 2001, showed central disc herniations at L3–4, L4–5, and L5–S1. A lumbar epidural steroid injection was done for back and left leg pain on October 25, 2001. By November 6, 2001, Dr. Sparks allowed Davidson to return to full work duty. On January 11, 2002, Davidson had CT-guided right sacroiliac joint injection, and on February 4, 2002, Davidson reported no troubles or pain to Dr. Sparks.

On June 23, 2003, Davidson was getting out of a company truck to get diesel fuel when he slipped and fell, injuring his lower back. Fearing he had severely injured his back, he requested to go to the doctor. He saw Dr. Sparks the next day on June 24, 2003, and was diagnosed with acute strain and acute myospasm. He was given prednisone, an anti-inflammatory drug, and was returned to full duty. He did go back to work on both June 24 and June 25, 2003. On June 25, 2003, Davidson was using a board to help direct the flow of concrete from a chute when he again injured his back.[3] He went back to Dr. Sparks, and an MRI was performed. It showed no interval change, and Davidson was given a duragesic patch to wear. Unfortunately, Davidson had a severe allergic reaction to the patch and was hospitalized

---

**3.** Although it is clear that these two incidents occurred on June 23 and 25, 2003, the parties stipulated that Davidson sustained an accident arising out of and in the course of his employment with Mihalevich on June 24, 2003. Therefore, we will refer to the injury throughout as the June 24, 2003 injury.

on June 30, 2003. In the hospital he was under the care of several pain specialists. On July 1, 2003, he was given another lumbar epidural steroid injection, prednisone, and other pain medications. On July 9, 2003, Dr. Sparks recommended that Davidson see a spine surgeon.

On July 11, 2003, Davidson saw Dr. Randal R. Trecha. On the intake form he filled out, Davidson cited October 12, 2001, as the onset of his problems. He received two additional epidural steroid injections, and the doctor recommended that he quit smoking and lose weight. On October 15, 2003, Dr. Trecha performed a discogram and recommended an anterior discectomy and fusion with instrumentation at L5–S1. In the intervening month, Davidson's pain was agonizing and progressively worsened. On November 18, 2003, the surgery was performed. On December 1, 2003, Davidson reported to Dr. Trecha that his back pain was almost gone.

He saw Dr. Trecha again on February 23, 2004, and noted that he was feeling a little worse in his right leg, with a little numbness and twitching, but no real back pain. He also stated to Dr. Trecha that his symptoms had started about three weeks prior when he had slipped and fallen on some ice. He saw Dr. Trecha again on April 5, 2004, and reported that he was walking two miles a day. Davidson reported some minor symptoms in his right lower extremity and aching across his back. X-rays showed a solid fusion of L5 on S1 with intact and in-place implants. Davidson said that he did not think he could return to work and requested some information about vocational rehabilitation.

On May 17, 2004, Davidson again saw Dr. Trecha and X-rays showed a solid fusion of the anterior space between L5 and S1 with intact and in-place implants. He said he was doing better but complained of discomfort in his right posterior iliac area. Dr. Trecha recommended a trigger point injection and a functional capacity evaluation. The functional capacity evaluation showed Davidson at a physical demand level of "medium." On June 2, 2004, Dr. Trecha pronounced Davidson at maximum medical improvement and rated his disability at 25% of the body as a whole.

Davidson has not worked since June 25, 2003. He testified that he did his best at the functional capacity evaluation but could not get out of bed for a day and a half after the evaluation. He further testified that he has constant pain every day, that activity makes his pain worse, and that he often gets tingling in his buttocks and legs and this progresses to shooting pains down his legs. He testified that he is comfortable sitting and/or standing for about twenty to thirty minutes and that he has to lie down often. He testified that he can sleep for about three hours at night and then has to get up and walk around.

Dr. Mark Lichtenfeld evaluated Davidson on October 19, 2004. As a result of the October 12, 2001 accident, he made the following diagnoses:

1. acute thoracic spine strain, resolved;
2. chronic lumbosacral spine strain;
3. multiple herniated discs at L3–4, L4–5, and L5–S1;
4. right sacroiliitis; and
5. lumbar radicular pain.

Dr. Lichtenfeld testified that Davidson had sustained a 25% permanent partial disability of the body as a whole due to the October 12, 2001 accident. He stated that this did not take into consideration any of Davidson's prior lumbar spine strains because they had all been resolved. He testified that the only preexisting disabilities at the time of the October 12, 2001 accident were Davidson's hearing and vision problems.

Dr. Lichtenfeld made the following diagnoses as a result of the June 24, 2003 accident:

1. exacerbation of chronic lumbosacral spine strain;

2. right lateralized herniated discs at L3–4 and L5–S1;

3. bilateral lateralization of the herniated disc at L4–5;

4. status post anterior discectomy and fusion at L5–S1 with allograft and hardware; and

5. right L4 and S1 radiculopathy.

He stated that the substantial cause of these diagnoses was the accident on June 24, 2003, and that, as a direct result of this injury, Davidson had sustained a 45% permanent partial disability of the body as a whole due to the June 24, 2003 accident. He further noted that this disability rating did not take into consideration any of Davidson's earlier injuries, including the October 12, 2001 injury. Dr. Lichtenfeld further testified that taking into consideration Davidson's educational background and vocational history, as well as his preexisting conditions and the injury to his back from June 24, 2003, he was totally and permanently disabled and unable to compete in the open labor market. However, he agreed that he was not a vocational expert and would defer to a vocational expert regarding Davidson's employability.

Timothy Lalk is a vocational rehabilitation counselor. He evaluated Davidson on January 11, 2005. Lalk testified that Davidson is unable to secure and maintain employment in the open labor market. Lalk indicated that Davidson's problems with his back would be the main hindrance to his ability to obtain and maintain employment. Specifically, Lalk stated that Davidson would not be able to compete with other applicants because Davidson would require accommodations from an employer which would allow him to rest repeatedly during the day; other applicants would not need the same type of accommodations. Lalk agreed that if one considered only the restrictions placed on Davidson by Dr. Trecha and the results of the functional capacity evaluation, Davidson would be employable. Lalk indicated in his report, however, that Davidson had attempted to find work as a foreman with the restrictions given to him by Dr. Trecha, but that knowledge about his injury had spread and this had prevented any employers from hiring him. Lalk also indicated that he believed Davidson's symptoms and limitations were more severe than those reported in the functional capacity evaluation and by Dr. Trecha.

The ALJ found in regard to the October 12, 2001 injury that Davidson's symptoms and condition had stabilized by February 4, 2002, and that his permanent disability from the October 12, 2001 accident was minimal. The ALJ thus concluded that Davidson suffered a permanent partial disability of 5% of the body as a whole as a result of the October 12, 2001 accident. Thus, Mihalevich was ordered to pay to Davidson 20 weeks of permanent partial disability benefits at the stipulated rate of $329.42, for a total of $6,588.40. For this injury, the claim against the Second Injury Fund was denied.

The ALJ found in regard to the June 24, 2003 injury that the accident had rendered Davidson permanently and totally disabled in accordance with section 287.020.7. The ALJ acknowledged that the functional capacity evaluation had indicated that Davidson had the ability to perform work at a "medium" physical demand level, and that Dr. Trecha had released Davidson with work restrictions consistent with the functional capacity evaluation. However, the ALJ indicated that he found the testimony of Dr. Lichtenfeld, Mr. Lalk, and Davidson himself more persuasive, particularly given

the court's ability to observe Davidson while he was in the hearing room. The ALJ noted that the claimant spent forty-five minutes of his almost three-hour testimony lying on the floor. The ALJ did not find the actions to be feigned or exaggerated. Thus, despite the evidence to the contrary, Davidson's mannerisms and testimony, as well as the testimony of Dr. Lichtenfeld and Mr. Lalk, convinced the ALJ that Davidson was permanently and totally disabled.

Further, the ALJ found that it was the June 24, 2003 injury *in and of itself* that rendered Davidson permanently and totally disabled. In so finding, the ALJ noted that all of Davidson's back injuries prior to the October 12, 2001 injury had been resolved, as shown by Dr. Lichtenfeld's testimony, the medical records, and by Davidson's ability to return to work without having to return to the doctor. After the October 12, 2001 injury, the ALJ acknowledged that Davidson was more injured than any of his previous injuries had left him, but still found that he had fully recovered as he was able to return to work eventually and did not have to return to the doctor until after he injured his back again in June of 2003. Based upon all of this, the ALJ concluded that the June 24, 2003 injury alone had rendered Davidson permanently and totally disabled. He found that the Second Injury Fund also had no liability for this injury. He ordered Mihalevich to pay the stipulated weekly compensation rate for permanent total disability benefits of $407.40 from June 3, 2004, for the rest of Davidson's life. The ALJ noted that as of February 22, 2006, 90 weeks of compensation had accrued, totaling $36,666.00.

Finally, the ALJ found that pursuant to section 287.140, Davidson was entitled to future medical benefits. He found that there was a reasonable probability that Davidson would at least be in need of continuing prescription medication for his pain and inflammation. Thus, he ordered Mihalevich to provide Davidson with future medical benefits.

Mihalevich filed an application for review with the Commission. On October 12, 2006, the Commission affirmed the award and decision of the ALJ, finding that the award was supported by competent and substantial evidence and was made in accordance with the Missouri Workers' Compensation Act. Mihalevich now appeals to this court.

### Standard of Review

Mihalevich's points on appeal claim that certain factual issues decided by the Commission were not supported by competent and substantial evidence. This court is permitted to "modify, reverse, remand for rehearing, or set aside the award" if "there was not sufficient competent evidence in the record to warrant the making of the award." Section 287.495.1(4). In making this determination, we must judge the award by examining the evidence in the context of the whole record. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223. This standard does not require us to view the evidence in the light most favorable to the award. *Id.* However, we defer to the Commission's determinations of credibility. *Martinez v. Nationwide Paper*, 211 S.W.3d 111, 115 (Mo.App.2006).

### Permanent Total Disability

In its first point, Mihalevich argues that the Commission should not have found Davidson permanently and totally disabled as a result of the June 24, 2003

injury alone, because no medical or vocational expert testified to the effect that he was permanently and totally disabled as a result of the last injury alone. We presume that Mihalevich is, therefore, suggesting that the Second Injury Fund should be responsible for at least part of Davidson's award due to his preexisting injuries.

Section 287.220 sets forth in what situations compensation shall be paid from the Second Injury Fund in all cases of permanent disability where there has been previous disability. *Landman v. Ice Cream Specialties, Inc.,* 107 S.W.3d 240, 248 (Mo. banc 2003), *overruled in part by Hampton,* 121 S.W.3d at 224.[4] The Commission concluded that all of Davidson's back injuries prior to October 12, 2001, did not constitute disabilities given that he had returned to full work duty with little treatment for each injury and Dr. Lichtenfeld had testified that all previous injuries had been resolved. The Commission found, however, that Davidson's October 12, 2001 injury left him permanently and partially disabled. Thus, he clearly had a preexisting disability when he was injured on June 24, 2003.[5]

■ When determining whether the Fund has any liability, the Commission must first determine the degree of disability from the last injury considered alone. *Id.* Preexisting disabilities are irrelevant until this determination is made. *Id.* If the last injury in and of itself rendered the claimant permanently and totally disabled, then the Fund has no liability and the

employer is responsible for all compensation. *Id.*

■ The Commission concluded that the June 24, 2003 injury alone caused Davidson's permanent total disability, and, therefore, the Fund had no liability despite Davidson's preexisting disability. Mihalevich claims this conclusion was contrary to the uncontradicted medical testimony. Mihalevich points to Dr. Trecha's testimony that Davidson's disability was 25% of the body as a whole as a result of the June 24, 2003 injury, and Dr. Lichtenfeld's testimony that Davidson had sustained a 45% permanent partial disability of the body as a whole due to the June 24, 2003 incident. The ALJ indicated that he considered Dr. Lichtenfeld's testimony to be credible, and the Commission apparently agreed. We defer to the Commission on the determination of the credibility of witnesses and the weight to be given to their testimony. *Birdsong v. Waste Mgmt.,* 147 S.W.3d 132, 139–40 (Mo.App.2004).

■ Mihalevich argues that Dr. Lichtenfeld's testimony that the June 24, 2003 injury caused only a 45% permanent partial disability shows that his total disability was not caused by the June 24, 2003 injury alone. Davidson is not restricted to a wheelchair or a hospital bed or unable to perform normal functions such as going to get himself a glass of water or using the bathroom by himself. It is important to note, however, that "permanent total disability," as defined by the statutes, does not refer to whether or not the employee is completely immobilized. *Brown v.*

**4.** Several of the cases that were overruled in part by *Hampton* are cited herein in support of other principles of law not affected by the *Hampton* ruling. For the sake of simplicity, no further acknowledgment of *Hampton's* effect on those cases is noted.

**5.** Mihalevich's arguments about Davidson's vision and hearing problems are irrelevant to this discussion given that the reason Davidson is unemployable is due to his constant back pain and his need to lie down for a large portion of the day in order to alleviate this pain, not because of his hearing and vision problems.

*Treas. of Mo.,* 795 S.W.2d 479, 483 (Mo. App.1990). Instead, the question is whether in the ordinary course of business an employer would reasonably be expected to hire the employee in his present physical condition. *Id.* Dr. Lichtenfeld's testimony of 45% was apparently a medical assessment, whereas his conclusion that Davidson was not employable is the conclusion pertinent to the statutory determination. The Commission is free to believe this testimony. *See Higgins v. Quaker Oats Co.,* 183 S.W.3d 264, 270 (Mo.App.2005) ("The Commission is free to believe all, part, or none of the evidence presented at the hearing."). Furthermore, the fact that Davidson was eventually able to return to full work duty following the October 12, 2001 injury supports the finding that the June 24, 2003, injury alone caused his total and permanent disability.

In addition, Dr. Lichtenfeld's testimony was supported by other evidence on the record that the Commission found credible. The vocational expert presented, Mr. Lalk, also suggested that no employer would reasonably be expected to hire Davidson given that he would require accommodations which would allow him to rest repeatedly during the day. Davidson's testimony indicated that he was not able to sit or stand for longer than about twenty or thirty minutes and had to lie down periodically in order to relieve his back pain.

The ALJ observed Davidson and based his conclusions partially on his observations that Davidson was permanently and totally disabled. Davidson appeared to the ALJ to be in real pain, requiring Davidson to spend a considerable amount of his time testifying lying on the floor in order to alleviate his back pain.

Mihalevich argues that the ALJ substituted his opinion for the opinions of the medical experts, and, therefore, his conclu-sion that Davidson was permanently and totally disabled as a result of the June 24, 2003 injury alone was not based on sufficient competent evidence. Mihalevich cites the case of *Wright v. Sports Associated, Inc.,* 887 S.W.2d 596 (Mo. banc 1994), in support of its argument.

In *Wright,* the employee injured his neck when he had to carry a fifty pound can of fuel for approximately 1.5 miles. *Id.* at 599. A doctor diagnosed a herniated disc in the employee's neck. *Id.* The employee sought an award for workers' compensation because of the herniated disc. *Id.* The ALJ in that case rejected the uncontradicted medical expert's diagnosis of a herniated disc and instead concluded that based on his knowledge and experience as an ALJ, the employee did *not* have a herniated disc because the employee did not have "immediate, noticeable symptoms ... in the upper extremities or the neck area." *Id.* He, therefore, denied workers' compensation to the employee. *Id.* The employee appealed, and the Missouri Supreme Court reversed, stating that "[t]he commission may not substitute an administrative law judge's personal opinion on the question of medical causation of a herniated disc for the uncontradicted testimony of a qualified medical expert." *Id.* at 600.

It is generally recognized that the reason we defer to lower courts and to those who conduct trials and hearings on matters of fact is because they are in a superior position to observe the demeanor, attitude, and actions of the testifying witnesses in order to determine the weight and credibility to give to the witness's testimony. *See Dunkle v. Dunkle,* 158 S.W.3d 823, 832–33 (Mo.App.2005). It was perfectly acceptable for the ALJ to observe Davidson in order to conclude whether his testimony about his back pain deserved to be believed or not. The ALJ did no more than this. He certainly

did not substitute his own supposed medical expertise for any uncontradicted medical testimony as the ALJ in *Wright* had. The Commission was perfectly free to rely on the ALJ's observations of Davidson when it adopted the ALJ's findings. Moreover, as we have already outlined, the Commission's conclusion that Davidson was totally and permanently disabled as a result of the June 24, 2003 injury alone is supported by testimony given by Dr. Lichtenfeld and Mr. Lalk. The Commission's determination, therefore, was not contrary to uncontradicted expert testimony.

There was substantial and competent evidence from which the Commission could conclude that Davidson was permanently and totally disabled as a result of the June 24, 2003 injury by itself. Accordingly, the Commission did not err in concluding that the Fund had no liability. Point denied.

### Future Medical Treatment

■ In its second point, Mihalevich argues that the Commission's finding that Davidson needs future medical treatment as a result of the June 24, 2003 injury is erroneous because it is not supported by substantial and competent evidence. Specifically, Mihalevich argues that the expert opinions were influenced by a subsequent injury and deterioration.

■ Section 287.140 allows for the cost of future medical treatment in a workers' compensation case. A claimant is not required to present evidence of any specific medical treatment which may be needed in the future, and he need not produce conclusive testimony or evidence to support his claim for future medical benefits. *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 283 (Mo.App.1997). It is sufficient for the claimant to show a "reasonable probability" that he is in need of additional medical treatment as a result of his work-related accident. *Id.*

Mihalevich first argues that Dr. Trecha put Davidson at maximum medical improvement on June 2, 2004. Dr. Lichtenfeld, on the other hand, indicated that Davidson would need further treatment. Mihalevich argues that Dr. Trecha's testimony should be given the most weight because Dr. Trecha was Davidson's treating physician and a surgeon, whereas Dr. Lichtenfeld evaluated Davidson only for the purpose of trial and is a family physician. It is unclear to us that this dictates that Dr. Trecha's testimony should be given more weight. Although Dr. Trecha was Davidson's treating physician, Dr. Lichtenfeld had the same medical records and evidence available to him. Dr. Trecha is a surgeon, but the issue is not whether Davidson will require further surgery.

Second, although Dr. Trecha stated that Davidson was at maximum medical improvement, this does not necessarily mean that Davidson is not still in need of future medical treatment. *See Landman*, 107 S.W.3d at 248. The record shows that Davidson still experiences an extreme amount of pain. Dr. Lichtenfeld's testimony supports the ALJ's finding that Davidson needs further treatment in that he will need pain medication for the relief of his back pain. Davidson is entitled to treatment as may be reasonably necessary "to ... *relieve* ... the effects of the injury." Section 287.140.1 (emphasis added). Treatment, such as pain medication, that relieves his pain is permitted under the statute. *See Landman*, 107 S.W.3d at 248. Dr. Trecha's finding that Davidson was at "maximum medical improvement" is not inconsistent with a need for future medical treatment. *See id.*

Even if we agreed with Mihalevich that Dr. Trecha's testimony was inconsistent with Dr. Lichtenfeld's, and that Dr. Tre-

cha's testimony should be given more weight, we are not permitted to substitute our judgment on this issue for the judgment of the Commission. *Birdsong,* 147 S.W.3d at 139–40. We defer to the weight the Commission gave to the testimony and evidence presented. *Id.* The Commission chose to believe testimony that indicated Davidson would need further medical treatment to relieve his back pain. Our examination of the record does not indicate that this determination was not supported by competent and substantial evidence.

Mihalevich also argues that the testimony that Davidson will need future medical care should not be believed because it was influenced by a subsequent injury that occurred in February of 2004, when Davidson fell on the ice.

■ There is little to no development of this issue on the record. It is not shown whether the slip and fall temporarily aggravated Davidson's back and then resolved itself, or whether it seriously affected his already-injured back. The record does not even state how Davidson fell: did he land on his back, on his behind, on his hip, on his knees? Since none of the experts make much of this injury on the record, the Commission could reasonably have assumed that it was not a significant aggravation of Davidson's back problems. We defer to the Commission's resolution of factual disputes regarding inferences. *Rana v. Landstar TLC,* 46 S.W.3d 614, 623 (Mo.App.2001). In any event, Mihalevich has failed to demonstrate to us that the injury was such as to render the Commission's determination erroneous. The Commission obviously determined that the February 2004 injury did not affect the determination that the June 24, 2003 injury was the cause of Davidson's need for medical treatment. Mihalevich does not demonstrate to our satisfaction that this

determination was erroneous. Point denied.

### Conclusion

For all of the foregoing reasons, the decision of the Commission is affirmed.

SPINDEN and BRECKENRIDGE, JJ., concur.