

# Missouri Court of Appeals

## Southern District

### Division One

DONALD PAYNE, )
)
        Claimant/Appellant, )
)
vs. )    No. SD32541
)    Filed: January 14, 2014
)
TREASURER OF THE STATE OF MISSOURI, )
CUSTODIAN OF SECOND INJURY FUND, )
)
        Respondent. )

APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

**AFFIRMED.**

Donald Payne ("Payne") appeals from a final award of the Labor and Industrial Relations Commission ("Commission") in a workers' compensation claim involving the Second Injury Fund ("SIF"). We affirm the Commission's award.

### Factual and Procedural Background

Payne was employed by J.B. Hunt Transport, Inc. ("Employer"), out of Lowell, Arkansas, as an over-the-road truck driver from approximately September 2004 until March 5, 2005.

On December 24, 2004, Payne started a trip and fell on ice at a truck stop. He stepped over a curb and as he did so, he slipped and lost his balance falling directly upon his back, landing mainly upon his shoulder blades. Payne tried to bend his neck upward, which meant that his shoulder blades took the brunt of the fall. Payne did not lose consciousness and was on the ground "[j]ust momentarily." His wife, who was riding with him, witnessed the fall. He arose with some assistance from his wife, walked back to his truck, and took a couple of Tylenol because he did not want to go inside the truck stop after having fallen. Instead he drove to Conway, Arkansas, where he "dropped a load." He was just feeling sore at that time.

On December 26, 2004, Payne called his dispatcher and informed him what had happened. He told the dispatcher the "biggest thing that was hurt was my pride." Payne initially thought he did not injure himself, but the discomfort in his shoulders continued to worsen. The pain hurt upon movement, especially around Payne's chest and up both sides of his heart. The muscles would pull causing chest pains and Payne could not tell whether the discomfort was from his shoulders or heart. Payne had a pre-existing heart condition.

Sometime in March 2005, Payne told Employer that he "couldn't put it off no more that I needed to get it checked out." Employer referred Payne to Tallgrass Immediate Care in Topeka, Kansas, for medical treatment. On March 15, 2005, x-rays were done to both shoulders, which were "normal." Payne was diagnosed with "bilateral rotator cuff tendonitis" based upon positive impingement signs in both shoulders. Payne reported a decreased range of motion since his fall and it was recommended he start physical therapy. Payne was released to modified duty subject to restrictions of not lifting over twenty pounds, no reaching above shoulder level, or lifting above ankle level. It was anticipated that the duration of treatment for Payne would be two to four weeks.

Payne then moved to Aurora, Missouri, where he established care with Dr. Herman Damek ("Dr. Damek") upon the referral of Employer. Payne underwent physical therapy in Aurora from April 25, 2005, through May 18, 2005, which enabled him to regain range of movement, but it "did not increase the strength or do anything for the pain." Payne attended ten out of twelve sessions and reported pain, "grinding," and "popping" in his left shoulder, and increased soreness.

On May 15, 2006, at the request of Payne's attorney, an independent medical evaluation of Payne was conducted by Dr. Shane Bennoch ("Dr. Bennoch"). After review of Payne's medical records and a physical examination, Dr. Bennoch diagnosed Payne with an injury to his upper back and shoulders as a result of a "slip and fall," and "[b]ilateral rotator cuff injuries with weakness on abduction bilaterally." Dr. Bennoch opined that Payne's fall on December 24, 2004, was the "prevailing factor in causing the bilateral injuries of both shoulders and the resulting disabilities." Dr. Bennoch found Payne had permanent partial impairment of both shoulders; however, he was unable to give a specific impairment rating at that time as it was his opinion Payne required further diagnostic testing. Dr. Bennoch placed restrictions on Payne of occasional lifting and/or carrying of not more than 20 pounds, no frequent lifting of more than ten pounds, and limit pulling to 30 pounds. As for the reason for these restrictions, Dr. Bennoch cited Payne's "[b]ilateral rotator cuff injuries."

As to Payne's pre-existing conditions, Dr. Bennoch did rate Payne at 30% permanent partial impairment to the body as a whole as to his cardiovascular system due to his myocardial infarction and stent placement; 5% permanent partial impairment to the body as a whole due to hypertension; and 10% permanent partial impairment to the body as a whole due to his diabetes.

3

Because of the combination effect of Payne's impairments, Dr. Bennoch indicated a loading factor should be added.

On March 7, 2008, Payne filed a "Claim for Compensation" and included a SIF claim for pre-existing disability of "[c]ardiovascular system/myocardial infarction resulting stent placement, diabetes" occurring approximately 1997 resulting in "[a]pproximately 35-45% to the body as a whole."

On or about December 10, 2009, Payne settled his workers' compensation claim with Employer for $18,000, representing 12.5% permanent partial disability to the body as a whole, and received an additional $3, 000 for future medical expense.

In March 2010, Payne saw Dr. Justin Ogden ("Dr. Ogden"), an orthopedic surgeon, on the referral of Dr. Damek. Payne saw Dr. Ogden in March 2010. Dr. Ogden diagnosed Payne with chronic bilateral shoulder pain and noted Payne had not improved with six weeks of physical therapy and recommended MRI scans of both shoulders. The MRI scan to the left shoulder indicated a high-grade tearing of the distal supraspinatus tendon with a complete pinhole, fluid extending into the subacromial and subdeltoid bursa, and severe degenerative changes at the AC joint. The MRI of the right shoulder was limited due to "significant motion artifact." However, there was a 1.8 cm. complete supraspinatus tendon tear, and a partial tear of the infraspinatus, which appeared to involve about 50% of the tendon thickness along the articular surface. There was also fluid within the subacromial and subdeltoid bursa and severe degenerative changes at the AC joint.

In April 2010, Dr. Ogden reviewed the MRIs with Payne and diagnosed Payne with a "full-thickness rotator cuff tear on the right" and a "small pinhole full-thickness rotator cuff tear on the left." Dr. Ogden discussed treatment options with Payne, including additional physical

4

therapy, injections, or surgical repair. Dr. Ogden stated that the pain was not typical for rotator cuff tears and recommended proceeding with injections both for therapeutic and diagnostic purposes—injections were performed.

In May 2010,[1] Dr. Bennoch performed a second independent medical evaluation for Payne. Dr. Bennoch's diagnoses for Payne were: (1) traumatic injury to both shoulders; (2) right rotator cuff tear; and (3) left rotator cuff tear. Dr. Bennoch opined Payne had reached maximum medical improvement to both shoulders, unless further surgery was contemplated. Dr. Bennoch assigned an impairment rating for Payne of 40% permanent partial impairment to the right upper extremity at the shoulder due to rotator cuff tear, and 40% permanent partial impairment to the left upper extremity at the shoulder due to rotator cuff tear. Dr. Bennoch indicated these ratings took into account that up until one month prior to this exam, no treatment or testing was done. Dr. Bennoch's prior ratings to Payne's pre-existing conditions remained "[u]nchanged from the Independent Medical Evaluation report on May 15, 2006." Ultimately, Dr. Bennoch found Payne to be "permanently and totally disabled" unless he had surgery, and that Payne's injuries were directly related to his December 24, 2004 fall. Dr. Bennoch also recommended that Payne be seen by an orthopedic surgeon specializing in shoulder injuries, particularly chronic shoulder injuries.

Dr. Bennoch placed more stringent restrictions on Payne beyond his 2006 restrictions, including no lifting more than 10 pounds, no frequent lifting or carrying, and no pushing or pulling. Dr. Bennoch also restricted two postural activities for Payne—climbing and balancing, as well as one manipulative function, reaching. As to the reason for these restrictions, Dr.

---

[1] Dr. Bennoch issued a report following this second evaluation of Payne. In some parts of the record, and in the Commission's final award, the date of this report is referred to as "May 12, 2010," "May 14, 2010," and "May 14, 2012." We have elected to use the date of "May 14, 2010" as it more closely identifies with the date of the report and that used by the Commission.

Bennoch cited the medical/clinical findings that related to Payne's bilateral shoulder condition stemming from his December 2004 work injury.

In a letter dated May 25, 2010, Dr. Bennoch expounded further on Payne's impairment ratings and his pre-existing conditions. In this letter, Dr. Bennoch noted that in addition to Payne's prior stated pre-existing conditions, he had also been diagnosed with sleep apnea after the accident, but it was Dr. Bennoch's opinion it pre-existed the fall. As a result of these pre-existing conditions, and his "present medical status," Dr. Bennoch found Payne would not be "employable in the open labor market," and the reason for his unemployability was the "combination of bilateral shoulder disease along with pre-existing coronary artery disease, diabetes and severe obstructive sleep apnea."

In a second letter of July 6, 2010, Dr. Bennoch noted he failed to give an impairment rating due to Payne's "confirmed severe obstructive sleep apnea," and rated Payne's severe obstructive sleep apnea at 10% permanent partial impairment to the body as a whole.

On February 15, 2011, at the request of Payne's attorney, Payne was evaluated by Phillip Eldred ("Eldred"), a certified rehabilitation counselor. Eldred found Payne did "have impairments, which were vocationally disabling such as to constitute a hindrance or obstacle to employment before December 24, 2004." Eldred concluded Payne had "vocational restrictions at less than the sedentary work level[]"; there were no sedentary occupations to which Payne's skills would transfer if he were capable of working in sedentary work; Payne would be restricted to certain physical tasks and to certain work environments; Payne would not be retrainable to perform sedentary work; and his age significantly affected his ability to do gainful work. As a result, Eldred found that it was unlikely an "employer in the normal course of business would consider employing [Payne]."

6

On March 16, 2011, at the request of the SIF, Mary Titterington ("Titterington"), a vocational rehabilitation counselor, was asked to evaluate Payne by reviewing Payne's medical records, Dr. Bennoch's reports and letters, Eldred's report, and Payne's deposition. Titterington issued a report and opined that Payne had acquired transferable job skills through his past work of having the "ability to schedule workers for delivery, to supervise, to document delivery type of records in computers" and while he could not return to his former work of truck driving, there were jobs at the sedentary-to-light-level work Payne could perform.

On November 10, 2011, Payne proceeded to hearing on his claim against the SIF. Payne testified that his December 24, 2004 work injury made driving trucks uncomfortable, required lots of over-the-counter pain medications, and limited his shoulder strength and range of motion. He also testified the shoulder pain radiated into his chest muscles and made him feel like he was having a heart attack. After consulting with Dr. Ogden, Payne decided against having shoulder surgery.

Payne testified that since his December 24, 2004 injury, his shoulders had deteriorated to the point that he has arthritis in all of his joints. Payne specifically noted that repetitive motion caused an increase in soreness, even if doing light work. Using a 10-point scale, Payne stated his pain averages around a 5, but could increase to an 8 or a 10, with the worst being the pain that wraps around to his chest. Payne testified that even driving his own vehicle to the hearing resulted in shoulder and chest pain.

Payne also testified regarding his health conditions that pre-dated the December 24, 2004 work injury. Payne suffered a heart attack in December 1997 and had two stents placed in the left side of his heart. Payne's doctor advised him to avoid overexerting himself. Payne testified that as a result, he stayed away from unloading trucks. Payne stated he was able to drive "just

7

fine" following the heart attack because there was nothing wrong with his shoulders, arms, and upper body strength.

During his December 10, 2010 deposition, Payne testified that in the time period leading up to his 2004 work injury, he did not have problems or symptoms related to his cardiac condition. More specifically, Payne testified at his deposition as follows:

> Q. Okay. So you had what they call angioplasty where they put two stents in to [sic] arteries that are closing up?
>
> A. Yes, ma'am.
>
> Q. Okay. Since you had that cardiac surgery, have you continued to have problems or symptoms that you think are related to your heart condition?
>
> A. No, ma'am.
>
> Q. Okay. No shortness of breath or chest pain or heart beating too fast or anything like that?
>
> A. No, ma'am.
>
> Q. Okay. You are on medication for blood pressure. Does that medication control your high blood pressure?
>
> A. Yes, ma'am.
>
> Q. Leading up to when you hurt yourself in 2004, were you having any kind of symptoms or problems related to your heart that affected your ability to do your job in any manner?
>
> A. No, ma'am.
>
> Q. Okay. I assume you had to take DOT [(Department of Transportation)] exams?
>
> A. Yes, ma'am.
>
> Q. Were you able to always pass your DOT exam?
>
> A. Yes, ma'am.

8

Q.    Since 2004, have you had any heart problems?

A.    No, ma'am.

At the hearing on his claim against SIF, Payne attempted to clarify his previous deposition testimony, and the following colloquy took place between Payne and his attorney:

Q.    When [SIF's attorney] asked you if you had any heart problems, and that's not exactly what she said, but that's the gist of it?

A.    Uh-huh.

Q.    And you said, No. What did you mean her to take from that?

A.    I mean at that time, I was sitting there and I was feeling good and I'd been doing what I was supposed to do and, you know, I had no problems at that time. I did not tell her that - I didn't have heart trouble and I did not tell her that I can do all those things and not have a problem.

Payne also testified at both his deposition and the hearing as to his pre-existing diabetes. Payne's diabetes was not diagnosed until after December 24, 2004, and he was not undergoing any diabetes treatment leading up to his 2004 work injury. At the hearing, Payne indicated he would now attribute prior foot and leg swelling that happened when he drove for long periods to his then-undiagnosed diabetes.

In contrast, Payne testified at his deposition that he would not attribute any pre-existing problems or symptoms to his then-undiagnosed diabetes. Payne's deposition testimony was that he was not having any diabetes symptoms prior to December 2004. At his deposition, Payne denied any neuropathy or "pins and needles" in his extremities prior to December 2004, and he specifically denied having any problems with his arms, back, or legs during that period. At his deposition, Payne mentioned foot and ankle swelling in connection with his diabetes, but he stated that the swelling started in 2006 or 2007.

9

Payne was also questioned about sleep apnea as a pre-existing condition at both his deposition and the hearing. Payne was not diagnosed with sleep apnea until 2005, which was after his December 2004 work injury. When asked at the hearing whether he had any problems sleeping prior to his December 24, 2004 injury, Payne said no. However, Payne's wife did ride with him to make sure he did not drift off while on the road. When asked at his deposition whether he had any problems prior to December 2004 that were, in hindsight, attributable to sleep apnea, Payne said there were none. While he experienced occasional drowsiness, Payne testified that, based on how long he worked as an over-the-road trucker with the condition, he would not say that his sleep apnea actually hindered his ability to do his job. When questioned about his current sleeplessness at night, Payne stated that the primary reason he could not sleep was his shoulder pain.

Eldred testified and confirmed that in his opinion, Payne was permanently and totally disabled due to a combination of his December 24, 2004 work injury and pre-existing disabilities. On cross-examination, Eldred acknowledged there were no medical restrictions on Payne prior to his December 2004 work injury.

Payne entered into evidence the independent medical evaluation reports and letters of Dr. Bennoch and Dr. Bennoch's deposition testimony. In his deposition, Dr. Bennoch discussed Payne's last injury, and his pre-existing medical conditions, including Payne's cardiac condition, sleep apnea, and diabetes. In his deposition, Dr. Bennoch opined that Payne was not employable due to his collective medical problems. Dr. Bennoch was asked by Payne's counsel to elaborate:

10

Q.     And why do you believe that?

A.     Well, I mean, there are lots of jobs you would be unable to do with your shoulders, but there are probably some potential jobs you might be able to do. Whereas when you combine it with things such as sleep apnea, coronary artery disease, and diabetes, it rules out -- in my opinion, I don't think he -- he could work on a daily basis, 40 hours a week.

On cross-examination, Dr. Bennoch acknowledged that Payne did not report suffering from symptoms or problems related to his cardiac condition during the period leading up to his December 2004 injury. Dr. Bennoch confirmed that this omission was consistent with Payne's own deposition testimony denying cardiac problems prior to his December 2004 work injury. Dr. Bennoch was also asked about Payne's hypertension, something that Dr. Bennoch acknowledged was diagnosed after Payne's December 2004 work injury. Dr. Bennoch noted that the hypertension was controlled by medication and that Payne would have no disability from the hypertension.

Dr. Bennoch acknowledged that Payne's diabetes was diagnosed after the December 2004 work injury, and that it also was controlled by medication. Dr. Bennoch conceded that Payne would not have had any disability associated with diabetes. Regarding Payne's sleep apnea, Dr. Bennoch agreed that it was diagnosed after the December 2004 work injury, and that various forms of treatment were available for sleep apnea. Other than a CPAP breathing machine that Payne could not tolerate, Dr. Bennoch was uncertain whether Payne had pursued any other treatment options for his sleep apnea. Dr. Bennoch testified Payne did not report to him that the sleep apnea caused him any problems in his first evaluation.

Using the American Medical Association (AMA) guides, Dr. Bennoch assigned a 30% impairment rating for Payne's pre-existing cardiac condition due to the fact he had a heart attack and two stents placed in his heart. Dr. Bennoch testified impairment ratings are meant to identify

11

the level of dysfunction in a given area of the body. In contrast, disability ratings measure the actual negative effect on a person's ability to work. Dr. Bennoch conceded that while he rated Payne's heart condition at 30% impairment, Payne's true disability was much less based on the fact there were no continuing problems with his cardiac condition. Dr. Bennoch acknowledged that prior to his own examination of Payne, Payne did not have any imposed medical restrictions.

In his deposition, Dr. Bennoch qualified the opinion contained in his May 14, 2010 report that Payne was permanently and totally disabled by reason of his bilateral shoulder injuries, by saying that at the time he wrote that report, he was not aware of Payne's deposition testimony regarding his sleep apnea. However, Dr. Bennoch further testified that even without the sleep apnea, Payne's "bilateral shoulders alone would have been enough, in that present state, without any further treatment, to be permanently and totally disabled." Dr. Bennoch agreed Payne had undergone no further treatment for his bilateral shoulder condition.

The SIF entered into evidence the deposition of Titterington. She testified that Payne could perform sedentary-to-light work jobs such as a shipping and receiving clerk, unarmed security guard, night desk clerk, information clerk, gate attendant, light sales clerk, or cashier.

On cross-examination, Titterington admitted the only materials she reviewed were those furnished to her by the SIF. She also admitted she knew nothing about a speech impediment Payne had, and she did not accept Dr. Bennoch's opinions that Payne's pre-existing conditions preceded his on-the-job injury.

On March 21, 2012, the Administrative Law Judge ("ALJ") found Payne to be permanently and totally disabled due to a combination of Payne's December 24, 2004 work injury, and his pre-existing disabilities. In finding permanent total disability, the ALJ found the

12

vocational opinion of Eldred more persuasive than that of Titterington. The ALJ outlined the four-part test for permanent total disability, and then made the following observations:

> The [SIF] appears to primarily argue that Payne is not permanently and totally disabled. The [SIF], at least with the report and testimony of Titterington, does not argue that Payne is totally disabled due to the December 2004 accident alone or that he had a progression of personal medical conditions after his compensable injury that left him totally disabled irrespective of his accident. In any event, Payne's medical profile indicates physical conditions that posed as a hindrance or obstacle to employment necessary as an element for benefits against the [SIF]. . . . These include his cardiovascular disease, diabetes and sleep apnea. . . . The [SIF]'s argument goes to the second element of the test[.]

Using Payne's claimed limitations, the restrictions from Dr. Bennoch, and Eldred's vocational opinion, the ALJ ruled Payne was due permanent total disability benefits from the SIF.

The SIF filed an "Application for Review" with the Commission asserting that the ALJ's Award of permanent total disability benefits was erroneous. In specific support, the SIF provided four reasons the ALJ's award was erroneous. The first two claims of error related to Payne's inconsistent testimony and lack of credibility. The third claim of error was the finding that Payne is permanently and totally disabled which "does not comport with his pursuit of full-time, regular employment." SIF's fourth claim of error was the ALJ's finding that SIF's vocational expert was incorrect and "does not comport with the doctor's clear indication of [Payne]'s 'unlimited' manipulative ability." SIF further stated that, "[b]eyond these assertions," it intended to file a brief with the Commission. There was no motion to dismiss the Application for Review, nor did the Commission conclude the Application for Review was insufficient.

After reviewing the evidence, reading the briefs, and considering the whole record, the Commission issued its "Final Award Denying Compensation" on December 28, 2012. The Commission reversed the ALJ's Award of benefits against the SIF finding that Payne was

13

"permanently and totally disabled as a result of the primary injury considered alone and in isolation."

The Commission assessed the nature and extent of disability for Payne's 2004 work injury. On this issue, the Commission noted that Dr. Bennoch only assigned impairment ratings and that he testified that Payne's "true disability may be 'much less' than the impairment ratings he issued." Thus, the Commission found Dr. Bennoch's impairment ratings to be "of little help."

The Commission also found Dr. Bennoch's restrictions "somewhat confusing":

> [I]n his report of May 18, 2006, Dr. Bennoch initially assigned postural limitations secondary to [Payne]'s preexisting weight and cardiovascular conditions. Then, in his report dated May 14, 2010, Dr. Bennoch identified the same restrictions, but this time suggested they were referable to the primary injury. Finally, at his deposition, Dr. Bennoch testified that all the limitations he identified in his first report are for the primary shoulder injuries. We take it that Dr. Bennoch retracts his initial restrictions referable to preexisting conditions and ultimately believes that all of the restrictions he identified are referable to the primary injury.

The Commission also noted Dr. Bennoch's conflicting opinion testimony on the cause of Payne's permanent total disability. Dr. Bennoch opined in his May 14, 2010 report that Payne was permanently and totally disabled due to the effects of the December 2004 work injury alone. Then, at his deposition, Dr. Bennoch opined that Payne was totally disabled "owing to a 'collection' of his medical problems." The Commission further noted that later on cross-examination, Dr. Bennoch agreed that Payne's bilateral shoulder condition alone was enough to make him permanently and totally disabled.

The Commission also considered the vocational opinions of both Eldred and Titterington. The Commission found "most credible Dr. Bennoch's opinion, conceded on cross-examination, that [Payne] is permanently and totally disabled owing to the work injury considered alone." While conceding that Payne had some pre-existing disability, the Commission concluded that the

14

reason for his total disability was the primary injury considered alone and in isolation. The Commission concluded Payne failed to meet his burden of proving SIF liability for permanent total disability benefits. This appeal followed.

The issues presented for our determination are:

1.  Did the Commission have authority to consider whether Payne was permanently and totally disabled from his last injury alone based on SIF's Application for Review?

2.  Was SIF estopped from arguing Payne was permanently and totally disabled from the last accident alone because SIF previously argued during pre-trial discovery, at the hearing, and in its Application for Review, that Payne was not permanently and totally disabled at all; was Payne prejudiced by SIF's argument because he had to "rebut a phantom defense on appeal after the record was closed"?

3.  Was the Commission's finding that Payne was permanently and totally disabled from the last accident alone against the weight of the evidence?

**General Standard of Review in Workers' Compensation Claims**

As set forth in article V, section 18 of the Missouri Constitution, judicial review of the Commission's award is a determination of whether the award is "supported by competent and substantial evidence upon the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003) (internal quotation marks omitted). Pursuant to section 287.495.1,[2] this Court

shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award; [and]

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

---

[2] All references to statutes are to RSMo 2000, unless otherwise indicated.

15

§ 287.495.1; ***Hampton***, 121 S.W.3d at 222. An award that is clearly "contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." ***Id.*** at 223. This Court "must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." ***Fitzwater v. Dept. of Public Safety***, 198 S.W.3d 623, 627 (Mo.App. W.D. 2006). This Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony; we review questions of law *de novo*. ***Sell v. Ozarks Med. Ctr.***, 333 S.W.3d 498, 506 (Mo.App. S.D. 2011).

### *Points I and II: Commission's Review*

### Standard of Review

Payne's Point I claims the Commission erred in

finding that Payne was permanently and totally disabled from his last accident because [SIF] did not raise and thus preserve this issue in its Application for Review in that both § 286.090 and Commission regulation requires an applicant to raise the 'issue in said appeal' and to specifically state why the reasons that the findings and conclusions on controlling issues are not properly supported.

Questions of law, such as those raised under this point relied on, are reviewed by this Court *de novo* and we do not defer to the findings of the Commission. ***Sell***, 333 S.W.3d at 506.

### Analysis

Payne argues the Commission lacked "jurisdiction to review the issue of whether Payne was permanently and totally disabled from the fall because [SIF] did not include this issue in its Application for Review." Although we find SIF's application is not a model of clarity and should not be used as an example of error claimed in an Application for Review, we disagree with Payne's argument and believe SIF's application raises the issue of permanent and total disability from the fall alone.

16

Section 287.480.1 provides the process for review of an award by the Commission. This section provides that upon a timely application for review with the Commission, the full Commission shall review the evidence, or if considered advisable, hear the parties and their witnesses, and make an award. "Timely filing of an application for review is jurisdictional; thus, an untimely application divests the Commission's jurisdiction." *Nolan v. Degussa Admixtures, Inc.*, 246 S.W.3d 1, 5 (Mo.App. S.D. 2008). Here, there is no dispute among the parties that SIF filed a timely Application for Review, thereby invoking the Commission's jurisdiction. *Id.* Therefore, Payne's argument that the Commission "did not have *jurisdiction* to review the issue" is without merit. (Emphasis added).

The question then becomes whether the Commission had *authority* to consider whether Payne was permanently and totally disabled *from the last injury alone* based on SIF's Application for Review and/or adequate notice and opportunity for the parties to be heard on the issue. *Nolan*, 246 S.W.3d at 5. The Commission's regulations govern the contents of an application for review. *See* 8 CSR 20–3.030(3)(A) (2003).[3] Section (3) of 8 CSR 20-3.030 requires an applicant to state with specificity in the application the "reason the applicant believes the findings and conclusions of the administrative law judge on the controlling issues are not properly supported." 8 CSR 20-3.030(3). "It is not sufficient merely to state that the decision of the ALJ is not supported by competent or substantial evidence." *Mell v. Biebel Bros., Inc.*, 247 S.W.3d 26, 31 (Mo.App. E.D. 2008).

In this case, SIF's Application for Review alleged the ALJ's award of compensation for permanent total disability benefits from SIF was erroneous and that the "finding that [Payne] is permanently and totally disabled does not comport with his pursuit of full-time, regular

---

[3] 8 CSR 20-3.030 "*outlines procedures for appeals from a final award, order or decision made by an administrative law judge of the Division of Workers' Compensation.*" (Italics in original).

17

employment." While this allegation raised the issue of SIF's liability, we find it barely satisfies the 8 CSR 20-3.030(3) requirement that an applicant state their reasons with specificity. We make this finding because the allegation, in the thinnest way possible, raises SIF's liability for permanent total disability benefits.[4]

This Court has examined the issue of whether the Commission violated 8 CSR 20-3.030(3)(A) on two occasions. *See Nolan*, 246 S.W.3d at 1; ***Stonecipher v. Poplar Bluff R1 School Dist.***, 205 S.W.3d 326 (Mo.App. S.D. 2006). In ***Stonecipher***, the Commission specifically found it was not limited to review of the errors complained of by the moving party. 205 S.W.3d at 331. We did not render a decision on whether the applicable regulations limit the Commission's review to issues raised in the application for review, but instead found that even if the Commission could properly consider non-appealed matters "an issue we do not yet decide-- the Commission exceeded its power in [considering non-appealed matters] without [first] affording Claimant appropriate notice and opportunity to be heard." *Id.* at 332. We reiterated this same conclusion in *Nolan*, and noted "[d]ue process, in Missouri workers' compensation cases and elsewhere, contemplates the opportunity to be heard at a meaningful time and in a meaningful manner." *Nolan*, 246 S.W.3d at 5.

Although *Nolan* and *Stonecipher* are instructive, they are distinguishable in that consideration of whether a claimant was permanently and totally disabled from the last injury alone is not a "non-appealed issue" in this case. Rather, it became an "appealed issue" when SIF alleged the ALJ's award of compensation benefits from SIF was erroneous. The law with respect to the Commission's review of this matter then is clear:

---

[4] Payne did not file a motion to dismiss the Application for Review with the Commission.

18

'The Second Injury Fund compensates workers who are permanently and totally disabled by a combination of past disabilities and a primary work injury.' *Pursley v. Christian Hosp. Northeast/Northwest,* 355 S.W.3d 508, 513 (Mo.App.2011). Section 287.220 guides the Commission in determining when there is a previous disability that may be compensable from the Second Injury Fund. ***The Commission must first determine the degree of disability from the last injury alone***. *Mihalevich Concrete Constr. v. Davidson,* 233 S.W.3d 747, 754 (Mo.App.2007). Consequently, preexisting disabilities are not relevant until this determination is made. *Id.* If the primary injury standing alone rendered [Claimant] permanently and totally disabled, then the Second Injury Fund has no liability and [Employer] is responsible for all of the compensation. *Id.*

***Palmentere Bros. Cartage Serv. v. Wright***, 410 S.W.3d 685, 691 (Mo.App. W.D. 2013) (emphasis added).

Under the above-cited case law, the Commission must first determine the degree of disability from the last injury alone when determining whether there is a disability that may be compensable from SIF. *See **Mihalevich***, 233 S.W.3d at 754 (holding "[w]hen determining whether [SIF] has any liability, the Commission must first determine the degree of disability from the last injury considered alone."). SIF raised the issue of its liability to Payne in the application by claiming the finding of SIF's liability was erroneous, thus thereby triggering the Commission's duty to first determine the degree of disability from the last injury alone, regardless of whether SIF specifically request the Commission to make such a finding. The Commission's award asserted its authority to determine the disability from the last injury as follows:

For [SIF] to be liable for permanent total disability benefits, [Payne] must establish that: (1) he suffered a permanent partial disability as a result of the last compensable injury; and (2) that disability combined with a prior permanent partial disability to result in total permanent disability. . . . Section 287.220.1 requires us to first determine the compensation liability of [E]mployer for the last injury, considered alone. If [Payne] is permanently and totally disabled due to the last injury considered in isolation, [E]mployer, not [SIF], is responsible for the entire amount of compensation.

19

The case law is clear that once the issue of SIF's liability is before the Commission, the Commission must first determine the degree of disability from the last injury alone. *Mihalevich*, 233 S.W.3d at 754. If the Commission determines the last injury alone rendered the claimant permanently and totally disabled, then SIF has no liability. *Id.*

Finally, the parties agreed that the overall issue of whether Payne was permanently and totally disabled was fully briefed and before the Commission. Therefore, we find the Commission had authority to consider whether Payne was permanently and totally disabled from his last injury alone based on SIF's Application for Review. Payne's Point I is denied.

The same reasoning above applies to Payne's Point II argument. In Point II, Payne argues SIF was "estopped from arguing" Payne was permanently and totally disabled from the last accident alone because SIF argued all along Payne was not permanently and totally disabled. This argument again ignores the Commission's obligation to first determine the degree of disability from the last injury considered alone in determining SIF's liability. *See Mihalevich*, 233 S.W.3d at 754; s*ee also* Point I *supra*.

Regardless of SIF's argument, the Commission was obligated to first determine the degree of disability from the last injury alone when determining SIF liability. For that reason, we find Payne was not prejudiced and the Commission did not err in finding Payne was permanently and totally disabled from the last accident alone. Payne's Point II is denied.

### Point III: Commission's Finding is Not Against the Weight of the Evidence

#### Standard of Review

'Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record.' [*Hampton*, 121 S.W.3d at 223]. 'An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.' *Id.* Thus, 'on a claim that an award is against the weight of the evidence, we examine the evidence in the context of the whole record to determine whether it is supported by competent and substantial evidence.' [*Fitzwater*, 198 S.W.3d at 627]. Furthermore, on appeal, 'no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the [C]ommission within its powers shall be conclusive and binding.' Section 287.495.1. As such, 'we defer to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony.' *Pavia v. Smitty's Supermkt.*, 118 S.W.3d 228, 234 (Mo.App.2003).

*Sell v. Ozarks Med. Ctr.*, 333 S.W.3d at 505-06.

#### Analysis

Successful against-the-weight challenges, by their nature, involve four steps:

1. Identify a factual proposition needed to sustain the result;

2. Marshal all record evidence supporting that proposition;

3. Marshal contrary evidence of record, subject to the factfinder's credibility determinations, explicit or implicit; and

4. Prove, in light of the whole record, that the step 2 evidence and its reasonable inferences are so non-probative that no reasonable mind could believe the proposition.

*Jordan v. USF Holland Motor Freight, Inc.*, 383 S.W.3d 93, 95 (Mo.App. S.D. 2012) (citing *Stewart v. Sidio*, 358 S.W.3d 524, 527–28 (Mo.App. S.D. 2012); *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App. S.D. 2010)). In *Jordan*, this Court noted that *Hampton* speaks in terms of "'overwhelming weight,' which may reflect a difference in degree, but not in analysis." 383 S.W.3d at 95 n.3.

Payne challenges the Commission's factual finding that "Dr. Bennoch's opinion as stated in his May 14, 201[0], report, and as conceded on cross-examination at his deposition, to be the most credible on the question whether [Payne] is permanently and totally disabled owing to the effects of the work injury considered alone." Payne contends there are various facts that contradict that finding, and then argues reasons why the facts that support the Commission's findings lack probative value when compared to the contradictory facts. Payne's argument is that the Commission's finding is contrary to the testimony and report of vocational consultant Eldred, reports of Dr. Bennoch, testimony of Payne, report and testimony of vocational consultant Titterington, and the position taken by SIF before the Division.

"But contradictions in fact alone do not negate evidence nor make it incompetent." *Riley v. City of Liberty*, 404 S.W.3d 434, 441 (Mo.App. W.D. 2013). It is the job of the Commission to sort through and resolve conflicts in evidence and "*when the evidence before an administrative body would warrant either of two opposed findings*, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Id.* (emphasis in original). Simply put, it is the role of the Commission to make credibility determinations between medical opinions. *Id.* at 442.

With respect to the question of whether Payne was permanently and totally disabled due to the last injury alone, the Commission sorted through the evidence connected to Dr. Bennoch, including his testimony, cross-examination, reports, opinions in his reports, and differing restrictions Dr. Bennoch gave Payne over time and basis for the restrictions. The Commission also considered Payne's testimony, Eldred's testimony, and Titterington's testimony on this issue. While there was conflicting testimony, the Commission sorted through the evidence,

resolved the conflicting evidence, and ultimately determined Dr. Bennoch's opinion in his May 14, 2010 report was the most credible on this issue.[5] This was the Commission's job.

Noting again that this Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given their testimony, *Sell*, 333 S.W.3d at 506, we find there was competent and substantial evidence to support the Commission's award. Based on our standard of review, we find the Commission's finding that Payne was permanently and totally disabled from the last accident alone was not against the weight of the evidence. Point III is denied.

WILLIAM W. FRANCIS, JR., J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. - Concurs

DANIEL E. SCOTT, J. - Concurs

---

[5] The Commission noted it reached this conclusion "[a]fter careful consideration."